**BURSOR & FISHER, P.A.**
Philip L. Fraietta (State Bar No. 354768)
50 Main St., Ste. 475
White Plains, NY 10606
Telephone: (914) 874-0710
Facsimile: (914) 206-3656
E-mail: pfraietta@bursor.com

**BURSOR & FISHER, P.A.**
Ines Diaz Villafana (State Bar No. 354099)
1990 North California Blvd., 9th Floor
Walnut Creek, CA 94596
Telephone: (925) 300-4455
Facsimile: (925) 407-2700
E-mail: idiaz@bursor.com

*Attorneys for Plaintiffs*

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| BIANCA SLAVIERO and AISLEY DAVIS, individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>BABY LIST, INC.,<br><br>Defendant. | Case No.<br><br>**CLASS ACTION COMPLAINT**<br><br>JURY TRIAL DEMANDED |

Plaintiffs Bianca Slaviero and Aisley Davis (collectively, "Plaintiffs") file this class action complaint on behalf of themselves and all others similarly situated (the "Class Members") against Defendant, Baby List, Inc. ("Babylist" or "Defendant"). Plaintiffs bring this action based upon personal knowledge of the facts pertaining to themselves, and on information and belief as to all other matters, by and through the investigation of the undersigned counsel.

**NATURE OF THE ACTION**

1. This is a class action suit brought against Baby List, Inc., for breaching its customers' trust and allowing companies scattered around Silicon Valley to invade its customers' privacy through its website, babylist.com (the "Website") and its mobile application, Babylist (the "Mobile App"). In particular, Babylist helped Meta Platforms, Inc. ("Meta"), Google, LLC ("Google"), and Twilio, Inc. ("Twilio") (the "Third Parties") collect and intercept customers' communications with Babylist when they affirmatively inputted responses to the onboarding survey on the Website and/or Mobile App.

2. Babylist's business focuses on simplifying the baby registry process for consumers and assisting them with navigating the modern parenting landscape and its associated consumer market. Babylist provides a platform for consumers to compile a list of products across all online retailers to create a centralized baby registry, provides guides that discuss and disseminate parenting advice, and curates "Best of" lists for certain commonly purchased baby products like strollers, high chairs and bassinets.

3. Consumers use the Website and Mobile App as expectant parents who hope to streamline their baby registry by having one central point for friends and family to make purchases in anticipation for the arrival of their child. What consumers don't know is that their parenting journey is not so personal.

4. Instead, Babylist has allowed the Third Parties to contemporaneously capture the electronic communications consumers direct towards Babylist through its Website and Mobile App. And all of this is done to help Babylist assist its marketing, advertising, and data analytics efforts. As such, Babylist "aids, agrees with, employs, or conspires" to permit the Third Parties to read, attempt to read, learn, and/or to use the confidential communications of its Website and

Mobile App visitors without prior consent, thus violating the Federal Wiretap Act, 18 U.S.C. § 2510, *et seq.*, California Invasion of Privacy Act ("CIPA"), Cal. Penal Code §§ 631(a) and 632. Plaintiffs bring this action on behalf of all California residents and people nationwide who answered Babylist's onboarding survey on the Website and Mobile App, and whose electronic communications were intercepted or recorded by Meta, Google, and Twilio, and other third parties. Babylist has enabled these Third Parties to intercept visitors' communications by employing these Third Party services to track users across the Website and Mobile App (collectively the "Tracking Tools").

## PARTIES

### I. PLAINTIFFS

5. Plaintiff Bianca Slaviero is an adult citizen of the state of California and resides in San Francisco, California.

6. In September 2025, Plaintiff Slaviero visited Babylist's Mobile Application while in California. While on The App during the sign-up process, Plaintiff Slaviero answered Babylist's onboarding survey questions, including whether she was pregnant or doing adoption or surrogacy, her expected due date, whether she is a first time parent, and more. Plaintiff Slaviero's answers to the survey questions were sensitive communications intercepted in transit by Twilio as enabled by Babylist. Neither Babylist, nor Twilio procured Plaintiff Slaviero's prior consent to this interception. Plaintiff Slaviero did not discover and could not have discovered this violation until approximately October 2025 upon her retention of counsel.

7. Plaintiff Aisley Davis is an adult citizen of the state of California and resides in Douglas City, California.

8. Prior to April 2024, Plaintiff Davis visited Babylist's Website while located in California to create a baby registry. During the sign-up process, Plaintiff Davis answered Babylist's onboarding survey questions, including whether she was pregnant or doing adoption or surrogacy, her expected due date, whether she is a first time parent, and more. Plaintiff Davis's answers to the survey questions were sensitive communications intercepted in transit by Meta and Google—as enabled by Babylist. Neither Babylist nor the Third Parties procured Plaintiff Davis's

prior consent to this interception. Plaintiff Davis did not discover and could not have discovered this violation until approximately October 2025 upon her retention of counsel.

**II. DEFENDANT**

9. Defendant Baby List, Inc. ("Babylist") is a Delaware corporation with its principal place of business in Emeryville, California. Defendant touts it is "the leading digital destination for growing families" and has had over 100 million gifts purchased off of registries.[1]

## JURISDICTION AND VENUE

10. This Court has subject matter jurisdiction pursuant to the Class Action Fairness Act ("CAFA"), 28 U.S.C. §§ 1332(a), 1332(d)(2) because this case is a class action where the aggregate claims of all members of the proposed class are in excess of $5,000,000, exclusive of interest and costs, and at least one member of the proposed class is a citizen of a state different from at least one Defendant.

11. The Court has general personal jurisdiction over Defendant because Babylist's principal place of business is in Emeryville, California, meaning Defendant is at home in this forum.

12. Venue is proper in this District pursuant to 28 U.S.C. § 1391 because Defendant resides in the county in which this Court is located.

## FACTUAL ALLEGATIONS

**I. BACKGROUND OF THE FEDERAL WIRETAP ACT**

13. The original Federal Wiretap Act was enacted in 1934 "as a response to Fourth Amendment concerns surrounding the unbridled practice of wiretapping to monitor telephonic communications."

14. The Wiretap Act primarily concerned the government's use of wiretaps, but Congress grew concerned that technological advancements like "large-scale mail operations, computer-to-computer data transmissions, cellular and cordless telephones, paging devices, and video teleconferencing" were rendering the Wiretap Act out of date. S. Rep. No. 99-541, at 2

[1] https://www.babylist.com/about

(1986). Thus, in 1986, Congress amended the Wiretap Act through the Electronic Communications Privacy Act ("ECPA") to provide a private right of action for private sector intrusions as though they were government intrusions.

15. Title I of the ECPA amended the Wiretap Act such that a violation occurs when a person or entity: (i) provides an electronic communication service to the public; and (ii) intentionally divulges the contents of any communication; (iii) while the communication is being transmitted on that service; (iv) to any person or entity other than the intended recipient of such communication.

16. While the ECPA allows a single party to consent to the interception of an electronic communication, single party consent is only acceptable where the communication is not "intercepted for the purpose of committing any criminal or tortious act in violation of the Constitution or laws of the United States or of any State." 18 U.S.C. § 2511(2)(d).

## II. BACKGROUND OF THE CALIFORNIA INFORMATION PRIVACY ACT

17. The California Information Privacy Act ("CIPA"), Cal. Penal Code § 630, *et seq.*, prohibits aiding or permitting another person to willfully – and without the consent of all parties to a communication – read or learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line, or cable, or is being sent from or received at any place within California.

18. To establish liability under Cal. Penal Code § 631(a), a plaintiff need only establish that the defendant, "by means of any machine, instrument, contrivance, or in any other manner," does any of the following:

> Intentionally taps, or makes any unauthorized connection, whether physically, electrically, acoustically, inductively, or otherwise, with any telegraph or telephone wire, line, cable, or instrument, including the wire, line, cable, or instrument of any internal telephonic communication system,
>
> Or
>
> Willfully and without the consent of all parties to the communication, or in any unauthorized manner, reads or attempts to read or learn the contents or meaning of any message, report, or communication while the same is in

> transit or passing over any wire, line or cable or is being sent from or received at any place within this state,
>
> Or
>
> Uses, or attempts to use, in any manner, or for any purpose, or to communicate in any way, any information so obtained,
>
> Or
>
> Aids, agrees with, employs, or conspires with any person or persons to unlawfully do, or permit, or cause to be done any of the acts or things mentioned above in this section.

19. Section 631(a)'s applicability is not limited to phone lines, but also applies to "new technologies" such as computers, the internet, and email. *See Matera v. Google Inc.*, 2016 WL 8200619, at *21 (N.D. Cal. Aug. 12, 2016) (CIPA applies to "new technologies" and must be construed broadly to effectuate its remedial purpose of protecting privacy); *Bradley v. Google, Inc.*, 2006 WL 3798134, at *5-6 (N.D. Cal. Dec. 22, 2006) (CIPA governs "electronic communications"); *In re Facebook, Inc. Internet Tracking Litigation*, 956 F.3d 589 (9th Cir. 2020) (reversing dismissal of CIPA and common law privacy claims based on Meta's collection of consumers' internet browsing history).

20. To establish liability under Cal. Penal Code § 632, a plaintiff needs to show that the defendant:

> intentionally and without the consent of all parties to a confidential communication, uses an electronic amplifying or recording device to eavesdrop upon or record the confidential communication, whether the communication is carried on among the parties in the presence of one another or by means of a telegraph, telephone, or other device, except a radio.

21. Under Cal. Penal Code § 637.2, Plaintiffs and Class Members may seek injunctive relief and statutory damages of $5,000 per violation.

## III. PLAINTIFFS' AND CLASS MEMBERS' COMMUNICATIONS INVOLVE SENSITIVE TOPICS

22. As described above, Babylist's business centers on simplifying the baby registry process for consumers and assisting them in navigating the modern parenting landscape and its

associated consumer market.

23. Thus, Plaintiffs' and Class Members' communications with Defendant via the Website and Mobile App during the onboarding process are sensitive communications because they directly relate to women's fertility, sexual and reproductive health, and family planning. Sexual and reproductive functions are often subjects considered highly personal and can often carry stigma. Additionally, family planning, or the topic of starting a family, is also deeply personal and not information people will share openly at the pregnancy stage.

24. Aside from carrying stigma, advertisers can also monetize women's sexual and reproductive health data at the expense of women's privacy. That is because data about a woman's reproductive and sexual health can be worth a lot of money to advertisers. For example, "[t]he data of pregnant women is particularly valuable to advertisers: expecting parents are consumers who are likely to change to their purchasing habits . . . ."[2] Thus, while "an average person's data is worth $0.10" a "pregnant woman's will be $1.50."[3]

25. Aside from being highly valuable data, consumers' sexual and reproductive health data is also sensitive and warrants protection from use without consumers' consent. This is evidenced by the fact the California Legislature recently enacted an amendment to its Confidentiality of Medical Information Act ("CMIA"). Seeing the need to provide data privacy protections for California residents that use "digital health products and services that collect and transmit certain health data" "given the increasingly hostile environment around reproductive" healthcare, the California Legislature enacted an amendment to the CMIA to include "'reproductive or sexual health application information' in the definition of 'medical information' and the businesses that offer reproductive or sexual health digital services to consumers in the definition of a provider of health care for purposes of the [CMIA]."[4] The California Senate Rules

[2] *No Body's Business but Mine: How Menstruation Apps Are Sharing Your Data*, PRIVACY INT'L (2019), https://privacyinternational.org/long-read/3196/no-bodys-business-mine-how-menstruations-apps-are-sharing-your-data.

[3] *Id.*

[4] CALIFORNIA COMMITTEE REPORT, CONFIDENTIALITY OF MEDICAL INFORMATION ACT: REPRODUCTIVE OR SEXUAL HEALTH APPLICATION INFORMATION, 2023 California Assembly Bill No. 254, California 2023-2024 Regular Session.

Committee Report emphasizes that "'[r]eproductive and sexual health information is clearly health information, and is particularly sensitive given the criminalization of almost any form of ending a pregnancy. Our current data protections do not speak to the sensitivity of this data.'"[5]

26. Specifically, the CMIA amendment expanded the definition of medical information under the statute to include "reproductive or sexual health application information" which includes "information from which one can ***infer someone's pregnancy status***, menstrual cycle, fertility, hormone levels, birth control use, sexual activity, or gender identity." *See* Cal. Civ. Code § 56.05(q) (emphasis added).

27. And while the current case does not fall under the protection of the CMIA[6], the type of sensitive communications Defendant enables third parties to intercept here, answers to Babylist's survey questions on the Website and the Mobile App whereby users are affirmatively inputting responses to survey question that inquire about the users family planning status (ex. *Pregnancy, adoption, surrogacy*, or *trying*), alerts Third Parties to someone's pregnancy status, menstrual cycle, fertility, hormone levels, birth control use, sexual activity, or gender identity, which is defined as medical information under the CMIA. *See* Cal. Civ. Code § 56.05(q).

28. Thus, Defendant's violation of Plaintiffs' and Class Members' privacy in enabling the interception of Plaintiffs' and Class Members' communications was a serious breach of consumers' trust and privacy.

## IV. AN OVERVIEW OF THE THIRD PARTIES' TRACKING TOOLS.

29. Defendant has purposefully installed Meta, Google, and Twilio's tracking tools on its Website and Mobile App. Therefore, Defendant has enabled these Third Parties to intercept Plaintiffs' and Class Members' communications by employing the Third Parties' tracking tools on its Website and Mobile App in the manner described throughout this Complaint.

---

[5] *Id.* (emphasis added).

[6] The current action does not fall under the protection of the CMIA given the type of website Defendant operates, among other factors. However, as described above, the type communications intercepted here mirror what the CMIA considers medical information and is thus highly confidential.

**A. The Meta Tracking Pixel**

30. Facebook, owned by Meta, describes itself as a "real identity platform,"[7] meaning users are allowed only one account and must share "the name they go by in everyday life."[8] To that end, when creating an account, users must provide their first and last name, along with their birthday and gender.[9]

31. Meta sells advertising space by highlighting its ability to target users.[10] Meta can target users so effectively because it surveils user activity both on and off its site.[11] This allows Meta to make inferences about users beyond what they explicitly disclose, like their "interests," "behavior," and "connections."[12] Meta compiles this information into a generalized dataset called "Core Audiences," which allows advertisers to reach precise audiences based on specified targeting types.[13]

32. Advertisers can also build "Custom Audiences."[14] Custom Audiences enables advertisers to reach "people who have already shown interest in [their] business, whether they're loyal customers or people who have used [their] app or visited [their] website."[15] With Custom

[7] Sam Schechner and Jeff Horwitz, *How Many Users Does Facebook Have? The Company Struggles to Figure It Out*, WALL. ST. J. (Oct. 21, 2021), https://www.wsj.com/articles/how-many-users-does-facebook-have-the-company-struggles-to-figure-it-out-11634846701?gaa_at=eafs&gaa_n=ASWzDAgBv80qmBk-eG84pjjaXQ_mKin6qQt2xKdYqf7uQnwVhlfB1FJcBH2IlXX7L8Q%3D&gaa_ts=688a0799&gaa_sig=jHy6omcjq_GiHNtDoU8ZxHL8K22doiw4-dodRtswq4rYDH1pK9mDK0B06csW-y2S7xLvXHKhIeRggAdBGESBzQ%3D%3D.

[8] META, COMMUNITY STANDARDS, PART IV INTEGRITY AND AUTHENTICITY, https://www.facebook.com/communitystandards/integrity_authenticity.

[9] META, SIGN UP, https://www.facebook.com/.

[10] META, WHY ADVERTISE ON FACEBOOK, https://www.facebook.com/business/help/205029060038706.

[11] META, ABOUT FACEBOOK PIXEL, https://www.facebook.com/business/help/742478679120153?id=1205376682832142.

[12] META, AD TARGETING: HELP YOUR ADS FIND THE PEOPLE WHO WILL LOVE YOUR BUSINESS, https://www.facebook.com/business/ads/ad-targeting.

[13] META, EASIER, MORE EFFECTIVE WAYS TO REACH THE RIGHT PEOPLE ON FACEBOOK, https://www.facebook.com/business/news/Core-Audiences.

[14] META, ABOUT CUSTOM AUDIENCES, https://www.facebook.com/business/help/744354708981227?id=2469097953376494.

[15] META, AD TARGETING, HELP YOUR ADS FIND THE PEOPLE WHO WILL LOVE YOUR BUSINESS, https://www.facebook.com/business/ads/ad-targeting.

Audiences, advertisers can target existing customers directly, and they can also build "Lookalike Audiences," which "leverages information such as demographics, interests, and behavior from your source audience to find new people who share similar qualities."[16] Unlike Core Audiences, advertisers can build Custom Audiences and Lookalike Audiences only if they first supply Facebook with the underlying data. They can do so through two mechanisms: by manually uploading contact information for customers, or by utilizing Facebook's "Business Tools."[17]

33. As Meta puts it, the Business Tools "help website owners and publishers, app developers and business partners, including advertisers and others, integrate with [Facebook], understand and measure their products and services, and better reach and serve people who might be interested in their products and services."[18] Put more succinctly, Meta's Business Tools are bits of code that advertisers can integrate into their website, mobile applications, and servers, thereby enabling Meta to intercept and collect user activity on those platforms.

34. The Business Tools are automatically configured to capture certain data, like when a user visits a webpage, that webpage's Universal Resource Locator ("URL") and metadata, or when a user downloads a mobile application or makes a purchase.[19] Meta's Business Tools can also track other events. Meta offers a menu of "standard events" from which advertisers can choose,

---

[16] META, ABOUT LOOKALIKE AUDIENCES, https://www.facebook.com/business/help/164749007013531?id=401668390442328.

[17] META, CREATE A CUSTOMER LIST CUSTOM AUDIENCE, https://www.facebook.com/business/help/170456843145568?id=2469097953376494; Facebook, Create a Website Custom Audience, https://www.facebook.com/business/help/1474662202748341?id=2469097953376494.

[18] META, THE FACEBOOK BUSINESS TOOLS, https://www.facebook.com/help/331509497253087.

[19] *See* META, FACEBOOK PIXEL, ACCURATE EVENT TRACKING, ADVANCED, https://developers.facebook.com/docs/facebook-pixel/advanced/; *see also* FACEBOOK, BEST PRACTICES FOR FACEBOOK PIXEL SETUP, https://www.facebook.com/business/help/218844828315224?id=1205376682832142; FACEBOOK, APP EVENTS API, https://developers.facebook.com/docs/marketing-api/app-event-api/.

including what content a visitor views or purchases.[20] Advertisers can even create their own tracking parameters by building a "custom event."[21]

35. A popular Business Tool is the Meta Tracking Pixel (the "Meta Pixel"). Meta offers this piece of code to advertisers, like Defendant, to integrate into its website. The Meta Pixel "tracks the people and type of actions they take."[22] When a user accesses a website hosting the Meta Pixel, Meta's software script surreptitiously directs the user's browser to contemporaneously send a separate message to Meta's servers. This secret and contemporaneous transmission contains the original GET request sent to the host website, along with additional data that the Meta Pixel is configured to collect. This transmission is initiated by Meta code and concurrent with the communications with the host website. At relevant times, two sets of code were thus automatically run as part of the browser's attempt to load and read Defendant's Website—Defendant's own code and Facebook's embedded code.

36. Each time Defendant sent this activity data, it allowed Meta to intercept user's personally identifiable information, including their Facebook ID ("FID"). A FID is a unique and persistent identifier that Facebook assigns to each user. With it, any ordinary person can look up the user's Facebook profile and name. Notably, while Meta can easily identify any individual on its Facebook platform with only their unique FID, so too can any ordinary person who comes into possession of an FID. Meta admits as much on its website. Indeed, ordinary persons who come into possession of the FID can connect to any Facebook profile.

37. A user who accessed Defendant's Website while logged into Facebook transmitted what is known as a "c_user cookie" to Meta, which contained that user's unencrypted Facebook ID.

---

[20] META, SPECIFICATIONS FOR FACEBOOK PIXEL STANDARD EVENTS, https://www.facebook.com/business/help/402791146561655?id=1205376682832142.

[21] META, ABOUT STANDARD AND CUSTOM WEBSITE EVENTS, https://www.facebook.com/business/help/964258670337005?id=1205376682832142; *see also* FACEBOOK, APP EVENTS API, https://developers.facebook.com/docs/marketing-api/app-event-api/.

[22] META, RETARGETING, https://www.facebook.com/business/goals/retargeting.

38. When integrated and embedded into a website, the Meta Pixel is not akin to a tape recorder or a "tool" used by one party to record the other. Instead, the Meta Pixel involves Meta, a separate and distinct third-party entity from the parties in the conversation, using the Meta Pixel to eavesdrop on, record, extract information from, and analyze a conversation to which it is not a party. This is so because Meta itself is collecting the content of any conversation. That information is then analyzed by Meta before being provided to any entity that was a party to the conversation (like Defendant).

39. Once Meta intercepts website communications, it has the capability to use such information for its own independent purposes. In 2021, Meta generated over $117 billion in revenue.[23] With respect to the apps offered by Meta, substantially all of Meta's revenue is generated by selling advertising space.[24] Meta sells advertising space by highlighting its ability to target users by including them in the Core Audiences and Custom Audiences offered to its clients.[25]

40. In practice, this means the information collected is used to (i) analyze trends in consumer behavior based on data collected from websites across the internet that Meta can then use when providing targeted advertising to other companies, (ii) create consumer profiles of specific users, allowing Meta to sell future customers targeted advertising to consumers with specific profile characteristics, and (iii) develop new Meta Business Tools products and services, or improve pre-existing Meta Business Tools products and services.

41. Meta's own documentation makes clear just how much tracking of private information the Meta Pixel does. It describes the Meta Pixel as code that Facebook's business customers can put on their website to "[m]ake sure your ads are shown to the right people. ***Find …***

---

[23] META, META ANNUAL REPORT 2021, https://s21.q4cdn.com/399680738/files/doc_financials/annual_reports/2023/2021-Annual-Report.pdf at 51.

[24] *Id.* at 63.

[25] META, WHY ADVERTISE ON FACEBOOK, INSTAGRAM AND OTHER META TECHNOLOGIES, https://www.facebook.com/business/help/205029060038706.

***people who have visited a specific page or taken a desired action on your website***." (Emphasis added.)[26]

42. Meta instructs such business customers that:

> Once you've set up the [Facebook Tracking] Pixel, ***the pixel will log when someone takes an action on your website***. Examples of actions include adding an item to their shopping cart or making a purchase. ***The Pixel receives these actions, or events***, which you can view on your [Facebook Tracking] Pixel page in Events Manager. From there, you'll be able to see the actions that your customers take. ***You'll also have options to reach those customers again through future Meta ads***.[27]

43. The Meta Pixel code enables Meta not only to help Defendant with advertising to its own users outside the Website but also includes users among groups targeted by ***other*** Facebook advertisers relating to the sexual and reproductive health, and family planning products about which Defendant's users communicated on Defendant's Website.

44. Meta's Business Help Center explains:

> Meta uses ***marketing data to show ads to people who are likely to be interested in them.*** One type of marketing data is website events, which are actions that people take on your website.[28]

45. In other words, Meta sells advertising space by highlighting its ability to target users.[29] Meta can target users so effectively because it surveils user activity both on and off its site.[30] This allows Meta to make inferences about users beyond what they explicitly disclose, like their "interests," "behavior," and connections.[31]

---

[26] META, ABOUT META PIXEL, https://www.facebook.com/business/help/742478679120153?id=1205376682832142.

[27] *Id.* (Emphasis added.)

[28] META, ABOUT STANDARD AND CUSTOM WEBSITE EVENTS, https://www.facebook.com/business/help/964258670337005?id=1205376682832142 (emphasis added).

[29] META, WHY ADVERTISE ON FACEBOOK, INSTAGRAM AND OTHER META TECHNOLOGIES, https://www.facebook.com/business/help/205029060038706 (last visited Dec. 26, 2023).

[30] Meta, ABOUT META PIXEL, https://www.facebook.com/business/help/742478679120153?id=1205376682832142.

[31] Meta, AD TARGETING: HELP YOUR ADS FIND THE PEOPLE WHO WILL LOVE YOUR BUSINESS, https://www.facebook.com/business/ads/ad-targeting.

46. An example illustrates how the Meta Pixel works. Take an individual who visits Defendant's Website and clicks on the link for "Start a Babylist Registry" on the front of the Website. When that "Start a Babylist Registry" link is clicked, the individual's browser sends a GET request to Defendant's server requesting that server to load the particular webpage. Because Babylist utilizes the Meta Pixel, Meta's embedded code, written in JavaScript, sends secret instructions back to the individual's browser, without alerting the individual that this is happening. Meta causes the browser to secretly duplicate the communication with Babylist, transmitting it to Meta's servers, alongside additional information that transcribes the communication's content and the individual's identity.

47. After collecting and intercepting the information described in the preceding paragraph, Meta processes it, analyzes it, and assimilates it into datasets like Core Audiences and Custom Audiences. In order to engage in the above-described processing, analysis, and assimilation, on information and belief, Meta has to view the information being processed, analyzed, and assimilated. As such, upon information and belief, Meta regularly viewed and used Plaintiffs and Class Members' communications that it intercepted via the Meta Pixel.

**B. Google Analytics Pixel**

48. Google offers a range of advertising software, one of which is called Google Analytics. "Google Analytics is a platform that collects data from [] websites and apps to create reports that provide insights" for businesses.[32]

49. This is made possible by the Google Analytics Pixel, a piece of code installed on a website that collects information on how website users interact with a business's website, such as "how many users bought an item ... by tracking whether they made it to the purchase-confirmation page."[33]

50. Google advertises this service can "[m]onitor activity on your site as it happens."[34]

---

[32] GOOGLE, HOW GOOGLE ANALYTICS WORKS, https://support.google.com/analytics/answer/12159447?hl=en&ref_topic=14089939&sjid=2827624563183915220-NC.

[33] *Id.*

[34] GOOGLE, THE FINER POINTS, https://marketingplatform.google.com/about/analytics/features/.

51. Google's business model involves entering voluntary partnerships with various companies and surveilling communications on their partners' websites with the Google Analytics Pixel.

52. Thus, through websites that employ Google's services, Google directly receives the electronic communications of website visitors entered onto websites via website features like search bars or drop-down menus.

53. That information is then analyzed by Google before being provided to any entity that was a party to the conversation (like Defendant). Upon information and belief, to analyze the intercepted communications, Google views the intercepted communications. As such, on information and belief, Google viewed Plaintiffs and Class Members' communications with Defendant to provide advertising services to Defendant. The data transmission described herein occurs concurrently with each user's activity, enabling Google to intercept sensitive data as it is generated. In other words, Google's interception of users' communications on the Website occurs "in transit."

54. When integrated and embedded into a website, Google's Analytics Pixel is not akin to a tape recorder or a "tool" used by one party to record the other. Instead, the Google Analytics Pixel involves Google, a separate and distinct third-party entity from the parties in the conversation, using the Google Analytics Pixel to eavesdrop on, record, extract information from, and analyze a conversation to which it is not a party. This is so because Google itself is collecting the content of any conversation. That information is then analyzed by Google before being provided to any entity that was a party to the conversation (like Defendant).

55. Once Google intercepts website communications, it has the capability to use such information for its own purposes. "Google uses the information shared by sites and apps to deliver [] services, maintain and improve them, develop new services, measure the effectiveness of advertising, protect against fraud and abuse, and personalize content and ads you see on Google and on [] partners' sites and apps."[35]

[35] GOOGLE, GOOGLE PRIVACY AND TERMS, https://policies.google.com/technologies/partner-sites.

56. Google's range of software services is based on Google's ability to collect and analyze information about consumers' web behavior and deliver targeted advertising to select consumers based on their web habits. This involves collecting visitor information from thousands of websites and then analyzing that information to deliver targeted advertising and group web users so that they can be targeted for products and categories they are interested in.

57. Google views the contents of the communications it intercepts to engage in its analyzation of the data. Google states that once the Google Analytics code on a website "collects data, it packages that information up and sends it to Google Analytics to be processed into reports. When Analytics processes data, it aggregates and organizes the data based on particular criteria."[36]

58. Information from websites, like Defendant's Website, is central to Google's ability to successfully market its advertising capabilities to future clients.

59. In sum, Google has the capability to use the communications it intercepts for its own purposes other than simply providing a recording to its customers, including but not limited to (i) improving its own products and services; (ii) developing new Google for Business and Google Analytics products and services; and (iii) analyzing website visitors' communications to assist with data analytics and targeted advertising.

**C. Twilio's Segment API**

60. Twilio is "a customer engagement platform used by hundreds of thousands of businesses and more than ten million developers worldwide to build unique, personalized experiences for their customers."[37] Segment is an Application Programming Interface ("API"), that is owned and operated by Twilio. Twilio's platform Segment API, offers "world-class customer data infrastructure, so [developers] can design hyper-personalized, omnichannel campaigns across all channels."[38] In particular, once integrated into a developer's website, the Segment API

---

[36] GOOGLE, *How Google Analytics Works*, https://support.google.com/analytics/answer/12159447?hl=en#.

[37] *What is Twilio? An introduction to the leading customer engagement platform*, TWILIO, https://www.twilio.com/en-us/resource-center/what-is-twilio-an-introduction-to-the-leading-customer-engagement-platform (last accessed Apr. 12, 2024).

[38] TWILIO SEGMENT, https://segment.com/twilio/.

provides Twilio's platform with "customer identification and segmentation,"[39] and it does this by "collecting and connecting data from other tools and aggregating the data to monitor performance, inform decision-making processes, and create uniquely customized user experiences."[40]

61. Babylist utilizes the Segment API on its Mobile Application and intercepts its consumers' onboarding survey answers, information on their sexual and reproductive health and family planning, to Twilio through the Segment API in order to assist with Babylist's marketing, advertising, and analytics efforts.

62. Twilio entices developers to integrate the Segment API by underscoring its signature feature: "Engage." Formerly known as Personas, Engage "is a powerful personalization platform that helps you create unified customer profiles."[41] Twilio creates these "unified customer profiles" by "tak[ing] event data from across devices and channels and intelligently merg[ing] it into complete user- or account-level profiles."[42]

63. Twilio builds these personas through "Segment Identity Resolution." This process "merges the complete history of each customer into a single profile, no matter where they interact with your business." The Segment Identity Resolution supports, among other identifiers, "cookie IDs, device IDs, emails, and custom external IDs," helping Twilio capture "a user's interaction across web, mobile, server and third party partner touch-points in real-time[.]" The Segment Identity Resolution then combines these "multiple external IDs," into "one persistent ID," culminating into its offered Persona.

64. With Identity Resolution, Twilio associates a users' AAID with a corresponding Persona Profile on Twilio's platform. Because Twilio assembles information from other sources into the Persona Profile, AAID alone allows Twilio to identify a particular person.

---

[39] Ingrid Lunden, *Twilio Confirms It Is Buying Segment For $3.2b In An All-Stock Deal*, TechCrunch (Oct. 12, 2020), https://techcrunch.com/2020/10/12/twilio-confirms-it-is-buying-segment-for-3-2b-in-an-all-stock-deal/.

[40] Segment.io Defined, INDICATIVE, https://www.indicative.com/resource/segment-io/.

[41] Documentation, SEGMENT, https://segment.com/docs/engage/.

[42] *Id.*

65. Twilio leverages these profiles to assist its customers, like Babylist, to enhance their marketing, advertising, and analytics efforts.

66. Babylist intercepts users' affirmative responses to survey questions concerning their sexual and reproductive health and family planning to Twilio through the Segment API so Twilio can better target its marketing campaigns. Babylist does this through Twilio's "Audience" feature, which "group[s] users or accounts based on event behavior and traits that Segment tracks."[43] In other words, the Audience feature allows for targeted marketing of advertisements at Engage profiles that fit specific parameters. As explained below, Babylist builds these marketing campaigns through Defendant's analytics services.

67. Babylist enables Twilio to intercept users' affirmative responses to survey questions concerning their sexual and reproductive health and family planning through the Segment API, so it can better target advertisements. After Babylist intercepts users' responses, Twilio compiles and transmits that information to other third parties that Babylist utilizes for targeted advertising.[44] Twilio labels these companies "Segment Destinations," which are tools that businesses use for personalization and marketing.[45] In this role, Twilio acts as a facilitator, compiling sensitive communications so developers can "personalize messages across channels, optimize ad spend, and improve targeting."[46] When Twilio transmits sensitive communication concerning users' sexual and reproductive health and family planning to Meta, for example, it sends "an expanded list of identifiers or traits to [Meta], so that [Meta] can try to use these additional datapoints to match to their user profiles."[47] The same goes for Google, with Twilio helping developers "run advertising

---

[43] ENGAGE AUDIENCE OVERVIEW, SEGMENT, https://segment.com/docs/engage/audiences/.

[44] USING ENGAGE DATA, SEGMENT, https://segment.com/docs/engage/using-engage-data/ (these third parties include Facebook, Google, and Salesforce).

[45] *Id.*

[46] *Id.*

[47] PERSONAS FACEBOOK CUSTOM AUDIENCES DESTINATION, SEGMENT, https://segment.com/docs/connections/destinations/catalog/personas-facebook-custom-audiences/.

campaigns without having to manually update the list of users to target in Adwords campaigns."[48] Babylist utilizes Defendant's API to amplify its advertising campaigns.

68. Twilio describes the above process as "building an Audience," meaning it "group[s] users or accounts based on event behavior and traits that Segment tracks."[49] As an example, Twilio lets developers "create[e] an 'inactive accounts' audience that lists paid accounts with no logins in 60 days."[50] After, "developers can push the audience to your marketing and analytics tools."[51]

69. In short, Babylist utilizes Twilio's Segment API to analyze user data, launch marketing campaigns, and target specific users or specific groups of users for advertisements. In this case, the data used was information about Plaintiff's and Class Members' sexual and reproductive health and family planning.

## III. BABYLIST ENABLES THE THIRD PARTIES TO INTERCEPT ITS WEBSITE USERS' COMMUNICATIONS THROUGH BABYLIST'S USE OF THE THIRD-PARTY TRACKING TOOLS

### A. Babylist Enables Meta, Through The Meta Pixel, To Intercept Users' Communications With Babylist.

70. Babylist has integrated the Meta Pixel, into its Website, Babylist.com**.** By integrating the Pixel into its Website code, Babylist has enabled Meta to intercept Babylist's website users' communications with Babylist as users complete the onboarding survey.

71. When a user inputs affirmative responses into the onboarding survey on Babylist's website, communicating their sexual and reproductive health and family planning information with Babylist, the Meta Pixel collects the URL for the page on the Website that the user is on. The URL includes users' responses to the onboarding survey on the Website.

72. For example, the first question in the onboarding survey, "[w]here are you in your journey" includes the following four answer options: (1) Pregnancy; (2) Adoption; (3) Surrogacy; and (4) Trying. *See* figure 1.

---

[48] *Id.*

[49] ENGAGE AUDIENCES OVERVIEW, SEGMENT, https://segment.com/docs/engage/audiences//.

[50] DOCUMENTATION, SEGMENT, https://segment.com/docs/engage/.

[51] *Id.*




**Figure 1**

73. Once the users select an answer and are navigated to the next question on the onboarding survey, the Meta Pixel intercepts the full-string URL event that includes metadata that tells Meta the users' answer to the question. Figure 2 below illustrates the full-string URL generated when the user selects the option for "Pregnancy" for the first question and that Meta intercepts this URL including the answer "Pregnancy."




**Figure 2**

74. Another example is the question that asks users if they are "a first-time parent". *See* Figure 3.




**Figure 3**

75. Once the user answers, the Meta Pixel intercepts the full-string URL event that includes metadata that tells Meta the users' input. Figure 4 below illustrates what the full string URL generated when the user answers "No" to the question about being a first-time parent. *See* Figure 4.




**Figure 4**

### B. Babylist Enables Google, Through Google Analytics, To Intercept Users' Communications With Babylist.

76. Babylist has also integrated Google Analytics, into the Website. By integrating Google Analytics into its Website code, Babylist has enabled Google to intercept the Website users' communications with Babylist as users complete the onboarding survey.

77. When a user inputs affirmative responses into the onboarding survey on the Website, communicating their sexual and reproductive health and family planning information with Babylist, because Babylist installed Google Analytics on its Website, Google Analytics collects the URL for the page on the Website that the user is on. The URL includes users' responses to the onboarding survey on the Website.

78. For example, once a user answers "Pregnancy" for the first survey question, Google intercepts the full-string URL generated that includes the user's answer to the question. *See* Figure 5.




**Figure 5**

79. Another example is when the onboarding survey asks a Website user to about their baby's arrival date. See Figure 6.




**Figure 6**

80. Once the user inputs their baby's arrival date, Google Analytics intercepts a full-string URL event that includes metadata that tells Google the users input. Figure 7 below illustrates what the full string URL Google intercepts when the user inputs the arrival date of "March 5, 2026."




**Figure 7**

**C. Babylist Enables Twilio Through Twilio's Segment API To Intercept Users' Communications With the Babylist Mobile Application.**

81. Babylist has integrated Twilio's Segment API into its mobile application, Babylist. By integrating Twilio's Segment API into its Mobile App's code, Babylist has enabled Twilio to intercept Babylist's Mobile App users' communications with Babylist as users as users complete the onboarding survey.

82. When a user inputs affirmative responses into the onboarding survey on the Mobile App, communicating their sexual and reproductive health and family planning information with Babylist, because Babylist installed Twilio's Segment API on its Mobile App, Twilio collects the

metadata for the page on the Mobile App that the user is on. The metadata includes the users responses to the onboarding survey on the Mobile App.

83. For example, once the users select answers to the onboarding survey, the Segment API intercepts the metadata that tells Twilio the users' answers to the questions. Figure 8 on the following page illustrates Twilio's interception of a user's survey answer of "Pregnancy" to the first onboarding question.


```
},
"anonymousId": "F5807B64-7E9F-44DC-843E-6A8D9A2FE454",
"integrations": {},
"_metadata": {
  "bundled": ["Firebase"],
  "unbundled": [
    "Algolia Insights (Babylist-Data-Engineering)",
    "Iterable",
    "Facebook Conversions API (Actions)",
    "Webhook",
    "LaunchDarkly"
  ],
  "bundledIds": []
},
"type": "track",
"messageId": "9D546740-DE2F-4C04-AB56-EDF2802B4616",
"event": "Onboarding Question Answered",
"properties": {
  "device_type": "mobile",
  "event_location": "Onboarding - Road Ahead",
  "answer": "pregnancy",
  "is_synthetic": false,
  "branch_id": "master",
  "library": "ios",
  "platform": "iOS 18.6",
  "app_version": "1.36.371"
}
```


**Figure 8**

84. Another example is when a user answers the question about their baby's arrival date. Once the user provides their baby's arrival date, Twilio intercepts the metadata that tell Twilio what the user's answer is. Figure 9 below shows Twilio's interception of the survey answer stating the baby's arrival date is "2025-08-22."

```
"properties": {
  "answer": "2025-08-22",
  "device_type": "mobile",
  "is_synthetic": false,
  "library": "ios",
  "branch_id": "master",
  "platform": "iOS 18.6",
  "app_version": "1.36.371",
  "event_location": "Onboarding - Arrival Date"
},
"messageId": "D5806717-1F9B-432C-80E2-BE55DB4D1A93",
"type": "track",
"_metadata": {
  "bundledIds": [],
  "bundled": ["Firebase"],
  "unbundled": [
    "Webhook",
    "Facebook Conversions API (Actions)",
    "Algolia Insights (Babylist-Data-Engineering)",
    "LaunchDarkly",
    "Iterable"
  ]
```


**Figure 9**

85. Twilio also shares users' survey answers with other third parties such as Algolia Insights, Interable, Facebook, Webhook and LaunchDarkly, as depicted in Figures 8 and 9 above.

**D. Babylist Never Received Users' Consent to Employ the Third Parties' Tracking Tools to Intercept Users' Communications**

86. Babylist allows the Third Parties to intercept users' confidential communications with Babylist without obtaining users' consent.

87. At no point during a person's use of either the Website or Mobile App does Babylist inform users that Babylist enables third parties to intercept users' communications with Babylist.

88. When a user inputs affirmative responses concerning their sexual and reproductive health and family planning into the onboarding survey on the Website or Mobile App, Babylist does not provide users with any type of notice about its practice of allowing third parties to intercept user communications with Babylist.

89. Thus, Babylist never properly obtains consent from its users to disclose their communications from either its Website or Mobile App.

## CALIFORNIA DELAYED DISCOVERY RULE

90. Plaintiff Davis's claims are preserved under California's delayed discovery rule due to the following:

91. Plaintiff Davis did not discover the causes of action she brings forth herein until her retention of counsel until approximately October 2025.

92. Plaintiff Davis did not have the ability to make an earlier discovery of the facts giving rise to this action, despite reasonable diligence, because Defendant did not provide her with notice of its practice of enabling the Third Parties' interception of her communications with Defendant as she answered the survey to set up her registry. Thus, Plaintiff Davis had no way of knowing that her communications with Defendant were not being kept confidential and were being intercepted by the Third Parties. Accordingly, Plaintiff Davis's claims are timely.

## CLASS ALLEGATIONS

93. Plaintiffs Aisley Davis and Bianca Slaviero seek to represent a class of all persons across the United States who inputted affirmative responses to Babylist's onboarding survey on Babylist's Website, babylist.com, and Mobile App, Babylist (the "Class" or "Nationwide Class").

94. Plaintiffs also seek to represent a subclass of all California residents who inputted affirmative responses to Babylist's onboarding survey on Babylist's Website, babylist.com, and Mobile App, Babylist while located in California (the "Subclass") (the Class and Subclass, collectively the "Classes").

95. Plaintiffs reserve the right to modify the class definition or add sub-classes as necessary prior to filing a motion for class certification.

96. The "Class Period" is the time period beginning on the date established by the Court's determination of any applicable statute of limitations, after considering of any tolling, concealment, and accrual issues, and ending on the date of entry of judgment.

97. Excluded from the Classes are Babylist; any affiliate, parent, or subsidiary of Babylist; any entity in which Babylist has a controlling interest; any officer director, or employee of Babylist; any successor or assign of Babylist; anyone employed by counsel in this action; any

judge to whom this case is assigned, his or her spouse and immediate family members; and members of the judge's staff.

98. **Numerosity.** Members of the Classes are so numerous that joinder of all members would be unfeasible and not practicable. The exact number of Class Members is unknown to Plaintiffs at this time; however, it is estimated that there are hundreds of thousands of individuals in the Classes. Class Members can be readily identified from Babylist's records and non-party records, such as those of Meta, Google, and Twilio.

99. **Typicality.** Plaintiffs' claims are typical of the claims of the Classes because Plaintiffs, like all other members, visited Babylist's Website and Mobile App and had their confidential electronic communications intercepted and disclosed to the Third Parties.

100. **Adequacy.** Plaintiffs are fully prepared to take all necessary steps to represent fairly and adequately the interests of the Classes. Plaintiffs' interests are coincident with, and not antagonistic to, those of the members of the Classes. Plaintiffs are represented by attorneys with experience in the prosecution of class action litigation generally and in the emerging field of digital privacy litigation specifically. Plaintiffs' attorneys are committed to vigorously prosecuting this action on behalf of the members of the Classes.

101. **Common Questions of Law and Fact Predominate.** Questions of law and fact common to the members of the Classes predominate over questions that may affect only individual members of the Classes because Defendant has acted on grounds generally applicable to the Classes. Such generally applicable conduct is inherent in Defendant's wrongful conduct. Questions of law and fact common to the Classes include, but are not limited to, the following: whether Defendant violated the Federal Wiretap Act, the CIPA §§ 631 and 632, and whether Plaintiffs and the proposed Class Members are entitled to damages, reasonable attorneys' fees, pre-judgment interest, and costs of this suit.

102. **Superiority.** Class action treatment is a superior method for the fair and efficient adjudication of the controversy. Such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, or expense that numerous individual

actions would engender. The benefits of proceeding through the class mechanism, including providing injured persons or entities with a method for obtaining redress on claims that could not practicably be pursued individually, substantially outweigh potential difficulties in the management of this class action. Plaintiffs know of no special difficulty to be encountered in litigating this action that would preclude its maintenance as a class action.

**COUNT I**
**Violation Of The Federal Wiretap Act,**
**18 U.S.C. § 2510, *et seq.***
**(On Behalf Of The Classes)**

103. Plaintiffs incorporate and reallege the foregoing allegations of fact.

104. Plaintiffs bring this claim against Defendant, Babylist, Inc., individually and on behalf of the Classes.

105. The Federal Wiretap Act, as amended by the Electronic Communications Privacy Act of 1986, prohibits the intentional interception of the contents of any wire, oral, or electronic communications through the use of a device. 18 U.S.C. § 2511.

106. The Wiretap Act protects both the sending and receiving of communications.

107. 18 U.S.C. § 2520(a) provides a private right of action to any person whose wire or electronic communications are intercepted, disclosed, or intentionally used in violation of Chapter 119.

108. Plaintiffs' and Class Members' answers to the survey questions on the Website and App qualify as "communications" under the Federal Wiretap Act's definition of 18 U.S.C. § 2510(12).

109. **Electronic Communications.** Plaintiffs and Class Members' answers to Defendant's survey questions are "transfer[s] of signs, signals, writing,…data, [and] intelligence of [some] nature transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic, or photooptical system that affects interstate commerce" and are therefore "electronic communications" within the meaning of 18 U.S.C. § 2510(2).

110. **Content.** The Federal Wiretap Act defines content, when used with respect to electronic communications, to "include [] any information concerning the substance, purport, or meaning of that communication." 18 U.S.C. § 2510(8).

111. **Interception.** The Federal Wiretap Act defines the interception as the "acquisition of the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical, or other device" and "contents…include any information concerning the substance, purport, or meaning of that communication." 18 U.S.C. § 2510(4), (8).

112. **Electronic, Mechanical, or Other Device.** The Federal Wiretap Act defines "electronic, mechanical, or other device" as "any device…which can be used to intercept a[n]…electronic communication[.]" 18 U.S.C. § 2510(5). The following constitute "devices" within the meaning of 18 U.S.C. § 2510(5):

113. Plaintiffs' and Class Members' browsers;

114. Plaintiffs' and Class Members' computing and cellular devices;

115. Defendant's servers; and

116. The third-party tracking technology deployed by Defendant to effectuate the sending and acquisition of user communications.

117. By utilizing and embedding the third-party tracking technology on the Website and App, Defendant intentionally intercepted, endeavored to intercept, and procured another person to intercept, the electronic communications of Plaintiffs and Class Members, in violation of 18 U.S.C. § 2511(1)(a).

118. Specifically, through Defendant's action of embedding the third-party tracking technology on the Website and App, which Defendant knew would track, store, and unlawfully transmit Plaintiffs' and Class Members' survey answers to Meta, Google, Twilio, and other third parties, Defendant procured the Third Parties to intercept Plaintiffs' and Class Members' electronic communications. *See* 18 U.S.C. § 2511(1)(a).

119. The communications Defendant allowed to be intercepted include, but are not limited to, communications to/from Plaintiffs and Class Members regarding their parenting journey, including pregnancy status and delivery date.

120. By intentionally disclosing or endeavoring to disclose the electronic communications of Plaintiffs and Class Members to the Third Parties, in the manner alleged herein, while knowing or having reason to know that the information was obtained through the interception of an electronic communication in violation of 18 U.S.C. § 2511(1)(a), Defendant violated 18 U.S.C. § 2511(1)(c).

121. By intentionally using, or endeavoring to use, the contents of the electronic communications of Plaintiffs and Class Members for analytics and marketing purposes, while knowing or having reason to know that the information was obtained through the interception of an electronic communication in violation of 18 U.S.C. § 2511(1)(a), Defendant violated 18 U.S.C. § 2511(1)(d).

122. **Unauthorized Purpose.** Defendant intentionally intercepted, and procured third parties, including Meta, Google, and Twilio, to intercept or endeavor to intercept, the contents of Plaintiffs' and Class Members' electronic communications for the purpose of committing a tortious act in violation of the laws of the United States or of any State – namely invasion of privacy under the CIPA.

123. Defendant intentionally used the wire or electronic communications to increase profit margins for itself. For instance, Defendant specifically used the third-party tracking technology to track and utilize Plaintiffs' and Class Members' communications for financial gain including but not limited to using the communications to target Plaintiffs and Class Members with advertisements on third-party platforms for marketing and retargeting purposes.

124. Defendant was not acting under color of law to intercept or procure the Third Parties to intercept or endeavor to intercept, Plaintiffs and Class Members' wire or electronic communications.

125. Plaintiffs and Class Members did not authorize Defendant to acquire the content of their communications for purposes of invading Plaintiffs' privacy by transmitting their communications via the third-party tracking technology or any other third-party platforms.

126. Any purported consent that Defendant received from Plaintiffs and Class Members was not valid.

127. In transmitting, acquiring, and procuring the Third Parties to intercept or endeavor to intercept the content of Plaintiffs' and Class Members' communications relating to the browsing of the Website, Defendant's purpose was tortious, criminal, and designed to violate federal and state legal provisions, including as described above the following: (1) a knowing intrusion into a private, place, conversation, or matter that would be highly offensive to a reasonable person; and (2) violations of CIPA.

**COUNT II**
**Violation Of The California Invasion Of Privacy Act,**
**Cal. Penal Code § 631**
**(On Behalf of the Classes)**

128. Plaintiffs incorporate by reference the preceding paragraphs as if fully set forth herein.

129. Plaintiffs bring this claim against Defendant, Babylist, Inc., individually and on behalf of the Classes.

130. CIPA § 631(a) imposes liability for "distinct and mutually independent patterns of conduct." *Tavernetti v. Superior Ct.*, 22 Cal. 3d 187, 192-93 (1978). Thus, to establish liability under CIPA § 631(a), a plaintiff need only establish that the defendant, "by means of any machine, instrument, contrivance, or in any other manner," does any of the following:

> Intentionally taps, or makes any unauthorized connection, whether physically, electrically, acoustically, inductively, or otherwise, with any telegraph or telephone wire, line, cable, or instrument, including the wire, line, cable, or instrument of any internal telephonic communication system,
>
> *Or*
>
> Willfully and without the consent of all parties to the communication, or in any unauthorized manner, reads or attempts to read or learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line or cable or is being sent from or received at any place within this state,
>
> *Or*
>
> Uses, or attempts to use, in any manner, or for any purpose, or to communicate in any way, any information so obtained,
>
> *Or*

> Aids, agrees with, employs, or conspires with any person or persons to unlawfully do, or permit, or cause to be done any of the acts or things mentioned above in this section.

131. CIPA § 631(a) is not limited to phone lines, but also applies to "new technologies" such as computers, the Internet, and email. *See Matera v. Google Inc.*, 2016 WL 8200619, at *21 (N.D. Cal. Aug. 12, 2016) (CIPA applies to "new technologies" and must be construed broadly to effectuate its remedial purpose of protecting privacy); *see also Javier v. Assurance IQ, LLC*, 2022 WL 1744107, at *1 (9th Cir. May 31, 2022) ("Though written in terms of wiretapping, Section 631(a) applies to Internet communications.").

132. The Third Parties' Tracking Tools are a "machine, instrument, contrivance, or … other manner" used to engage in the prohibited conduct at issue here.

133. The Third Parties, Meta, Google, and Twilio are "separate legal entit[ies] that offer[] [a] 'software-as-a-service' and not merely a passive device." *Saleh v. Nike, Inc.*, 562 F. Supp. 3d 503, 520 (C.D. Cal. 2021). Further, the Third Parties had the capability to use the wiretapped information for their own purposes. Accordingly, Meta, Google, and Twilio were third parties to any communication between Plaintiffs and Class Members, on the one hand, and Defendant, on the other. *Id.* at 521; *see also Javier v. Assurance IQ, LLC*, 649 F. Supp. 3d 891, 900 (N.D. Cal. 2023).

134. At all relevant times, the Third Parties willfully and without the consent of all parties to the communication, or in any unauthorized manner, read, attempted to read, and/or learned the contents or meaning of electronic communications of Plaintiffs and Class Members, on the one hand, and Defendant, on the other, while the electronic communications were in transit or were being sent from or received at any place within California.

135. At all relevant times, the Third Parties used or attempted to use the communications intercepted by their Tracking Tools to promote and improve their advertising platforms.

136. At all relevant times, Babylist aided, agreed with, employed, permitted, or otherwise enabled the Third Parties to wiretap Plaintiffs and Class Members using the Tracking Tools and to accomplish the wrongful conduct at issue here. Plaintiffs and Class Members did not provide their

prior consent to the Third Parties' intentional access, interception, reading, learning, recording, collection, and usage of Plaintiffs' and Class Members' electronic communications. Nor did Plaintiffs and Class Members provide their prior consent to Babylist aiding, agreeing with, employing, permitting, or otherwise enabling the Third Parties' conduct.

137. The wiretapping of Plaintiffs and Subclass Class Members occurred in California, where Plaintiffs and Class Members accessed the Website and Mobile App and where the Third Parties—as enabled by Babylist—routed Plaintiffs and Class Members' electronic communications to their servers.

138. The wiretapping of Class Members who reside outside of California also occurred in California given that the Third Parties' servers are located in California. Alternatively, because Defendant is a California entity, application of CIPA § 631(a) will apply extraterritorially.

139. Pursuant to Cal. Penal Code § 637.2, Plaintiffs and Class Members have been injured by the Third Parties' violations of CIPA § 631(a), Babylist's violations of CIPA § 631(a), and each seeks statutory damages of $5,000 for each of Defendant' violations of CIPA § 631(a).

**COUNT III**
**Violation Of The California Invasion Of Privacy Act,**
**Cal. Penal Code § 632**
**(On Behalf of the Classes)**

140. Plaintiffs incorporate by reference the preceding paragraphs as if fully set forth herein.

141. Plaintiffs bring this claim against Defendant, Babylist, Inc., individually and on behalf of the Classes.

142. CIPA § 632(a) prohibits entities from:

> intentionally and without the consent of all parties to a confidential communication, uses an electronic amplifying or recording device to eavesdrop upon or record the confidential communication, whether the communication is carried on among the parties in the presence of one another or by means of a telegraph, telephone, or other device, except a radio.

143. The Third Parties' Tracking Tools are "electronic amplifying or recording device[s]."

144. At all relevant times, the communications between Plaintiffs and Class Members on one hand, and Babylist on the other, were confidential.

145. At all relevant times, Babylist intentionally used the Tracking Tools and therefore enabled the Third Parties to eavesdrop upon and record such confidential communications.

146. When communicating with Babylist, Plaintiffs and Class Members had an objectively reasonable expectation of privacy. Plaintiffs and Class Members did not reasonably expect anyone other than Babylist to be a party to the communications, and did not expect that other, third-party entities, Meta, Google, and Twilio, would intentionally use an electronic amplifying or recording device to eavesdrop upon and record their confidential communications.

147. Plaintiffs and Class Members did not consent to any of the Third Parties' actions. Nor have Plaintiffs and Class Members consented to Babylist's enablement of the Third Parties' intentional use of an electronic amplifying or record device to eavesdrop upon and record the confidential communications of Plaintiffs and Class Members.

148. Pursuant to Cal. Penal Code § 637.2, Plaintiffs and Class Members have been injured by Defendant's violations of CIPA § 632(a), and each seeks statutory damages of $5,000 for each of Defendant' violations of CIPA § 632(a).

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, individually and on behalf of all others similarly situated, seek judgment against Defendant, as follows:

(a) For an order certifying the putative Classes, naming Plaintiffs as the representatives of the putative Classes, and naming Plaintiffs' attorneys as Class Counsel to represent the putative Class Members;

(b) For an order declaring that the Defendant's conduct violates the statutes referenced herein;

(c) For an order finding in favor of Plaintiffs and the putative Classes on all counts asserted herein;

(d) For statutory damages in amounts to be determined by the Court and/or jury;

(e) For prejudgment interest on all amounts awarded;

(f) For injunctive relief as pleaded or as the Court may deem proper; and

(g) For an order awarding Plaintiffs and the putative Classes their reasonable attorneys' fees and expenses and costs of suit.

**DEMAND FOR JURY TRIAL**

Plaintiffs, on behalf of themselves and the proposed Classes, demand a trial by jury for all of the claims asserted in this Complaint so triable.

Dated: November 4, 2025

**BURSOR & FISHER, P.A.**

By: /s/ *Philip L. Fraietta*

Philip L. Fraietta (State Bar No. 354768)
50 Main St., Ste. 475
White Plains, NY 10606
Telephone: (914) 874-0710
Facsimile: (914) 206-3656
E-mail: pfraietta@bursor.com

**BURSOR & FISHER, P.A.**
Ines Diaz Villafana (State Bar No. 354099)
1990 North California Blvd., 9th Floor
Walnut Creek, CA 94596
Telephone: (925) 300-4455
Facsimile: (925) 407-2700
E-mail: idiaz@bursor.com

*Attorneys for Plaintiffs*